UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

UBALDO ROMERO,                          :

                       Petitioner,      :     08 Civ 8380 (PAE)(HBP)

     -against-                          :
                                              REPORT AND
DAVID NAPOLI, Superintendent            :     RECOMMENDATION
of the Southport Correctional
Facility,                               :

                       Respondent.      :

----------------------------------X


            PITMAN, United States Magistrate Judge


            TO THE HONORABLE PAUL A. ENGELMAYER, United States

District Judge,


I.  Introduction


            Petitioner, Ubaldo Romero, seeks, by his pro se peti-

tion, a writ of habeas corpus pursuant to 28 U.S.C. § 2254

vacating a judgment of conviction entered on March 12, 2002,

after a jury trial, by the Supreme Court of the State of New

York, New York County (Snyder, J.), for two counts of murder in

the second degree, in violation of New York Penal Law Section

125.25(1).  Pursuant to that judgment, petitioner was sentenced

to two consecutive indeterminate sentences of twenty-five years

to life.   Petitioner is currently incarcerated pursuant to that judgment.

For the reasons set forth below, I respectfully recommend that the petition be denied.

II.  Facts

A.  Facts Giving Rise to
    Petitioner's Conviction

Petitioner's conviction arises out of the slaying of Etienne Adorno and Demetrio Flores on November 1, 1990.  On the evening of that day, petitioner and several other individuals approached a car parked on First Avenue in Manhattan between East 117th and East 118th Streets in which Adorno and Flores were sitting.  Petitioner and his accomplices riddled the car with bullets, inflicting a total of 21 gunshot wounds on Adorno and 8 on Flores.  The evidence at trial demonstrated that petitioner, a drug trafficker, and his conspirators shot Adorno and Flores because they were believed to be in the neighborhood to rob petitioner or his crew of narcotics or narcotics proceeds.

In 1990, petitioner's brother, Robert Romero, was living with his paramour, Maria Martinez, in a third floor apartment located on First Avenue between 117th and 118th Streets

(Tr.[1] 445-46).  Martinez testified that Robert managed several individuals who sold crack cocaine in the vicinity of 117th and 118th Streets (Tr. 450, 451, 457).  She also testified that petitioner participated in the operation by supplying the street dealers with drugs (Tr. 446, 457-58).  Several times a week, Martinez accompanied Robert to an abandoned apartment on 117th Street and First Avenue (the "Stash Apartment") where she helped Robert package crack for retail sale (Tr. 455-57).  The other individuals who participated in the narcotics operation included Wilson Cruz (Tr. 452, 1950-55, 2032), Frederick McBean (Tr. 1242-44, 1255) and Raymond Alvarez (Tr. 1620-35, 1637-40, 1642, 1652).

Also in 1990, Rafael Baez and Adorno began committing robberies in the East Harlem area of Manhattan (Tr. 724-26, 897).  The two targeted drug dealers because they carried the most money (Tr. 726-28).  In the fall of 1990, Flores joined the robbery crew (Tr. 732-36).  Petitioner and his brother were aware that drug dealers in the neighborhood were being robbed, but were apparently unable to identify the robbers (Tr. 1689-92).

During the late afternoon on November 1, 1990, Baez, Adorno and Flores met for the purpose of robbing the individuals who were openly selling drugs in the vicinity of 118th Street and

---

[1]Tr. refers to the transcript of petitioner's trial.

First Avenue (Tr. 736-37).  The three drove to the area in
Adorno's car, with Adorno and Flores in the front, Baez in the
rear (Tr. 738-39, 811).  Baez was armed with a .380 semi-auto-
matic pistol, Flores carried a fake .357 revolver and Adorno was
unarmed (Tr. 740-41, 788-89, 818-22).  Their plan was to sit in
the car and wait until they observed a drug dealer carrying a bag
of either drugs or money; Baez would then use his loaded gun to
perpetrate the robbery, while Flores, armed with his fake gun,
would act as back up (Tr. 817-20, 825).  After waiting in the car
for a few minutes, Baez got out of the car and walked to a gas
station 50 to 100 feet away to call his girlfriend (Tr. 746,
748).  He could not see Adorno's car from the gas station (Tr.
746-49).

        Sometime later that evening, the murders occurred.
Each of the prosecution's percipient witnesses offered a differ-
ent version of the shootings which cannot be melded together into
a consistent narrative.  I shall, therefore, summarize the
testimony of each separately.

    Wilson Cruz

        Cruz, who had pled guilty and testified pursuant to a
cooperation agreement, testified that he met with petitioner,
Robert and their two brothers at a restaurant in the vicinity of

4

118th Street and First Avenue at 6:30 or 7:00 p.m. during the evening of November 1, 1990 (Tr. 1973, 1977, 2187). Cruz asked Robert why he was crying and petitioner stated that his mother had just died and that "'those mother fuckers are going to pay'"[2] (Tr. 1973, 2188). Petitioner then told Cruz that he would give Cruz a gun and that petitioner wanted Cruz "to shoot these mother fuckers" (Tr. 1974, 2188).

A few minutes later, petitioner left to meet with the driver of a car that had pulled up outside the restaurant (Tr. 1975). Petitioner then re-entered the restaurant and told Cruz to meet with the driver of the car in front of the building in which the Stash Apartment was located (Tr. 1975-76). Cruz went to the designated location, and the driver handed Cruz a heavy bag; Cruz carried the bag into the Stash Apartment in which Martinez was present (Tr. 1978-79). When he got to the Stash Apartment, Cruz opened the bag and found between three and five guns in the bag, one of which looked to Cruz like a machine gun (Tr. 1980). About ten minutes later, petitioner and his three brothers arrived at the Stash Apartment (Tr. 1985). Robert grabbed a gun, had an argument with Martinez and left the apart-

---

[2]The record does not disclose how the death of petitioner's mother gave rise to a need for retribution against anyone. Cruz testified that he did not know what petitioner was talking about (Tr. 1974).

ment (Tr. 1985-87, 2189).  Petitioner then took a gun and handed one to each of his brothers and to Cruz (Tr. 1987, 2068-69, 2189).  Petitioner, his brothers and Cruz then followed Robert out of the apartment and towards 118th Street and First Avenue (Tr. 1989-91).  Robert approached a double-parked car containing two occupants and began shooting at it (Tr. 1990-94, 1997, 2190).  Cruz also approached the car and shot at the driver's side (Tr. 1992, 1995, 1997).  Petitioner shot at the car from a distance of about 17 feet (Tr. 1993-94, 1997).  Cruz did not recall any of the occupants of the car shooting back (Tr. 2168).

<u>Maria Martinez</u>

Martinez testified that on the afternoon of November 1, 1990, she and Robert learned that Robert's mother had died (Tr. 462-64, 700).  She went to another room in their apartment, and heard Robert and other male voices in the living room having a heated discussion (Tr. 485, 488).  Among other things, she heard one of the voices say that someone was trying to "take over the business" (Tr. 487).  She also heard Robert say "'Let's get the jammie,'" a term which she understood to mean a gun (Tr. 468, 487).

Martinez subsequently saw Robert, petitioner, Cruz and two other men "going through" a duffel bag in the hallway of her

apartment; she knew the bag contained guns (Tr. 470-71, 490-92).
When Robert saw that she was watching, he angrily told her to
leave and she went back inside her bedroom (Tr. 492-94).  After
hearing Robert and the others leave the apartment, Martinez
looked out her bedroom window and saw Robert, petitioner and Cruz
standing on the steps of her building; she could also see the
duffel bag and could see guns within it (Tr. 494-98).  Martinez
yelled out to Robert, and he brandished a gun at her and told her
to "[G]et the fuck back inside" (Tr. 498).

        Shortly thereafter, Martinez heard shooting, looked out
the window and saw Robert running toward a parked car, firing a
gun in the direction of the car (Tr. 499-500, 555).  She also
observed petitioner running toward the car, but did not see
anything in his hand (Tr. 671).  She also saw Cruz and another
man running toward the car (Tr. 501-02, 556-57).  She could also
see the person in the driver's seat of the car who appeared to be
"jumping up and down" as the shots were fired (Tr. 504).

        Tyrone Rich

        Rich did not offer testimony concerning the events
leading up to the shootings.  Rather, he testified that on the
evening of November 1, 1990, he had been smoking marijuana in the
vicinity of 118th Street and First Avenue when he heard what he

7

believed to be gun shots from a semiautomatic machine gun (Tr. 1088-89, 1100-01, 1173, 1177-78).  He saw two men running across First Avenue; he recognized petitioner as one of the men (Tr. 1090-91, 1126-27).  Petitioner was holding something with both hands which Rich believed to be a machine gun (Tr. 1091-95, 1112-13, 1117, 1128, 1152, 1184-86).

### Raymond Alvarez

Alvarez testified that on November 1, 1990 he saw Robert and his brother, Julio, firing shots into the blue car occupied by Adorno and Flores (Tr. 1647-48).  Alvarez hid in a store while the shooting was occurring and when the shooting stopped, he saw Robert, Julio and petitioner get into a burgundy colored car (Tr. 1647-49).  Alvarez did not testify that petitioner fired any shots (Tr. 1648-49).

### Rafael Baez

Baez testified that while he was on the telephone, he heard "loud and rapid" gunshots and saw two men firing at Adorno's car (Tr. 750-52).  He recognized one of the shooters as Cruz (Tr. 752-53).  Baez believed the second shooter was using a gun that could fire rapidly and continuously (Tr. 828-32).  Baez

fired several shots at the individuals firing at Adorno's car and then fled from the scene (Tr. 751-52, 761, 832-34, 965-66).

<u>Frederick McBean</u>

McBean testified that during the afternoon of November 1, he had been in his apartment which was adjacent to the Stash Apartment (Tr. 1269-72).  McBean heard a loud knock at the door of the Stash Apartment, and through the peephole in his door, he saw petitioner's brother, Julio, standing at the door of the Stash Apartment (Tr. 1273-04, 1504).  Petitioner opened the door of the Stash Apartment, and Julio told him that "some people" with whom they had had problems were downstairs; Julio then entered the Stash Apartment and the door closed (Tr. 1274, 1504-05).

McBean then put his ear to the wall of his apartment to hear what was being said in the Stash Apartment (Tr. 1274-75, 1595).  Julio said, "I sent Angie over there to take a look and she said, 'Yes, that's them'" (Tr. 1726).  Petitioner replied by asking, in substance, if Julio was sure it was "them," and Julio responded affirmatively (Tr. 1275-76).  Petitioner then told Julio, "Fine.  Go call a number that I told you about and don't worry about it, just go back out of the building like nothing was

9

wrong" (Tr. 1275-76).   McBean then saw both petitioner and Julio
leave his apartment building (Tr. 1277, 1281, 1590).

Several hours later, McBean saw two cars pull up and
stop on First Avenue, one directly behind the other (Tr. 1287,
1349-50).   Petitioner and three of his brothers got out of the
cars with machine guns and opened fire on a car that was parked
on the other side of the street (Tr. 1288-97, 1514, 1591).
According to McBean, two of the shooters fired from one side of
the car while the other two fired from the other side of the car
(Tr. 1291-94, 1394-95).   After the shooting, petitioner and his
brothers got back into the cars in which they had arrived and
left the scene (Tr. 1297-98).

### The Collazos

The final witnesses to the shooting were Francisco and
Brunilda Collazo who had stopped in the neighborhood to purchase
a pizza pie from Patsy's restaurant, located on First Avenue and
118th Street (Tr. 246, 261-62).   The couple had been driving home
when they stopped at Patsy's (Tr. 246, 261-62).   While Francisco
was in the restaurant picking up the pizza, Brunilda, who was
waiting in the car, heard shots and laid down on the seat (Tr.
248-49, 263).   Seconds thereafter, a man whose face Brunilda did
not see, entered the car, brandished a gun and demanded that

Brunilda get out of the car (Tr. 245-51, 260-65).  She complied, and the unknown individual drove away in the Collazo's car (Tr. 251-52).

Petitioner's Inculpatory Statements

    In addition to the foregoing testimony directly implicating petitioner in the shooting, the prosecution also offered two inculpatory statements made by petitioner.

    Cruz testified that after the shootings, he ran into petitioner at a neighborhood restaurant (Tr. 2005).  Petitioner asked Cruz if he still had "that" because petitioner "needed it" (Tr. 2005).  Cruz understood petitioner to be referring to the firearm that petitioner had given Cruz (Tr. 2005).  Cruz left the restaurant, retrieved the firearm and returned it to petitioner (Tr. 2006).  Petitioner told Cruz to call him if he heard anything about the shooting and to pretend he knew nothing about it (Tr. 2006).

    Cruz continued to sell drugs for petitioner after the murders (Tr. 2006-07), and at one point petitioner boasted to Cruz that "Niggers know around here how me and my brother[s] shot those two niggers up on the corner" (Tr. 2009).  Cruz heard petitioner make this same statement on more than two subsequent occasions (Tr. 2011).

11

Martinez also offered evidence of inculpatory state-
ments petitioner made about the shooting.  Martinez testified
that petitioner told her that if she "ever sa[id] anything" about
the shooting, she would be killed (Tr. 511).

B.  The Defense Case

Petitioner offered no evidence at trial.

C.  State Court Proceedings

On December 16, 1999, petitioner and his three brothers
were each indicted for two counts of murder in the second degree,
in violation of New York Penal Section 125.25.  Petitioner's
first trial commenced on April 16, 2001, before the Honorable
Edwin Torres, Justice of the Supreme Court, and a jury.  That
trial ended in a mistrial when the jury was unable to reach a
unanimous verdict.[3]

_____

[3]At various points in his submissions, petitioner claims
that the his first trial ended in a mistrial due to the
misconduct of the prosecutor who petitioner identifies Karen
Friedman-Agnifilo.  Petitioner even goes so far as to claim that
Ms. Friedman-Agnifilo was sanctioned by Justice Torres and
disbarred (see Petitioner's Memorandum of Law in Support of
Ubaldo Romero's Petition for Writ of Habeas Corpus (Docket Item
57) at 19 n.1).

According to the website of the New York County District
Attorney's Office, Ms. Friedman-Agnifilo currently serves as the
(continued...)

Petitioner's second trial commenced on January 2, 2002 before the Honorable Leslie Crocker Snyder, Justice of the Supreme Court, and a jury.  The jury returned its verdict on February 6, 2002, finding petitioner and his brother Robert guilty but acquitting petitioner's two other brothers -- George and Julio.

Assisted by counsel, petitioner appealed his conviction to the Appellate Division of the Supreme Court for the First Department.  Petitioner's brief raised three claims:  (1) the evidence was insufficient to establish the elements of murder in the second degree, or, in the alternative, the verdict was against the weight of the evidence; (2) the prosecutor deprived petitioner of a fair trial by making several unfair and inflamma-tory statements in summation and (3) the Trial Court denied petitioner a fair trial when it refused to read back a stipula-

---

[3](...continued)
Executive Assistant District Attorney and Chief of the Trial Division.  Meet the Trial Team, manhattanda.org, http://manhattanda.org/meet-executive-team?nid=55 (last visited July 2, 2013).  In addition, petitioner's brief on direct appeal, prepared with the assistance of counsel, states that "[t]he first trial ended with a deadlocked jury and a mistrial as to all four defendants . . ." (Appendix - Volume I (Docket Item 65), Exhibit A at 3), and makes no mention of any finding of prosecutorial misconduct, let alone misconduct so severe that it resulted in the disbarment of the prosecutor.  In light of these facts, I conclude that petitioner's claim that Ms. Friedman-Agnifilo engaged in misconduct or was disbarred to be a fabrication.

tion concerning Cruz's testimony in response to request from the
jury seeking "statements in evidence made by Willie Cruz or
detectives' summaries of what Willie said" (Appendix - Vol. I
(Docket Item 65), Ex. A at iii-v).  Petitioner's brother, Robert,
also appealed his conviction raising additional claims.

On October 5, 2005, the Appellate Division affirmed
both convictions.  People v. Romero, 22 A.D.3d 287, 804 N.Y.S.2d
8 (1st Dep't 2005).  The Court disposed of the claims asserted by
petitioner as follows:

> The verdict was based on legally sufficient evi-
> dence and was not against the weight of the evidence.
> The jury properly considered issues of credibility,
> including the weight to be given to the backgrounds of
> the People's witnesses, the benefits they received in
> return for testifying and the inconsistencies in their
> testimony, and there is no basis for disturbing the
> jury's determinations (see People v Gaimari, 176 NY 84,
> 94 [1903]).  Numerous witnesses inculpated defendants,
> and the jury could have reasonably concluded that
> differences in their perception and memory of details
> of this fast-paced, chaotic event accounted for the
> inconsistencies.
>
> The appellate challenges to the People's summation
> are largely unpreserved.  Were we to review the unpre-
> served claims, we would reject them.  In this vigor-
> ously litigated trial, the thrust of the prosecutor's
> remarks constituted fair comment on the evidence and
> they were made in response to defense arguments.  In
> short, the summation did not deprive either defendant
> of a fair trial (see People v Overlee, 236 AD2d 133
> [1997], lv denied 91 NY2d 976 [1998]; People v
> D'Alessandro, 184 AD2d 114, 118-119 [1992], lv denied
> 81 NY2d 884 [1993]).  To the limited extent the summa-
> tion may have contained objectionable matter, the

court's curative instructions effectively prevented any
prejudice.

The court responded meaningfully to the jury's
request for a readback of testimony, since the court
provided the testimony requested (see People v
Almodovar, 62 NY2d 126, 131-132 [1984]). Although the
court declined to read back a stipulation that related
to this testimony, the court reminded the jury of the
stipulation's existence and advised the jury it could
request additional testimony on the issue. However,
the jury did not request to hear the stipulation's
contents. Accordingly, the court's response did not
cause defendants any prejudice (see People v Lourido,
70 NY2d 428, 435 [1987]).

22 A.D.3d at 287-88, 804 N.Y.S.2d at 9-10.

Petitioner subsequently sought leave to appeal to the
New York Court of Appeals (Appendix - Vol II (Docket Item 20) Ex.
E). Petitioner's application raised only the first two claims
asserted before the Appellate Division, namely that that the
evidence was insufficient to support the conviction and and that
the prosecutor made unfair and inflammatory statements in summa-
tion. Although the New York Court of Appeals initially denied
leave to appeal, People v. Romero, 6 N.Y.3d 758, 843 N.E.2d 1166,
810 N.Y.S.2d 426 (2005), on reconsideration, it granted leave to
appeal. People v. Romero, 6 N.Y.3d 837, 847 N.E.2d 383, 814
N.Y.S.2d 86 (2006).

Before the Court of Appeals, petitioner argued only
that the Appellate Division had applied the incorrect standard in
assessing whether the verdict was against the weight of the

15

evidence;[4] it appears that petitioner abandoned his claims that the evidence was insufficient to sustain the verdict and that the prosecutor was guilty of misconduct during the summation.

The New York Court of Appeals affirmed petitioner's conviction on November 21, 2006, finding that the Appellate Division had applied the correct standard in determining whether the verdict was against the weight of the evidence.  After reviewing New York's history concerning appellate review of claims that a conviction is against the weight of the evidence, the Court of Appeals concluded that the Appellate Division did not, in fact, apply an obsolete standard to petitioner's against-the-weight-of-the-evidence claim:

---

[4]Petitioner's brief to the New York Court of Appeals framed the issue as follows:

QUESTION PRESENTED

Whether the Appellate Division, in affirming appellant's conviction on weight of the evidence review, erred in looking solely to whether there was any support in the record for the jury's resolution against appellant of the conflicts in the witnesses' testimony, pursuant to People v. Gaimari, 176 N.Y. 84, 94 (1903), rather than undertaking its own review of the conflicts in the testimony to determine whether appellant's conviction was against the weight of the credible evidence.  People v. Cahill, 2 N.Y.3d 14, 57-58 (2003); People v. Bleakley, 69 N.Y.2d 490, 495 (1987); [N.Y. Crim. Proc. L.] §470.15(5).

(Appendix - Vol, II (Docket Item 20), Ex. I at 2).

16

The Appellate Division recognized here that con-
flicting evidence was adduced at trial but, similar to
the Court in Gaimari, concluded that there was "no
basis for disturbing the jury's determinations" (22
AD3d at 287) -- i.e., the record revealed that the
verdict was supported by the facts -- a statement that
under Crum and Bleakley provided sufficient predicate
to reject defendant's challenge.  The Court further
explained that "[n]umerous witnesses inculpated defen-
dant[ ], and the jury could have reasonably concluded
that differences in their perception and memory of
details of this fast-paced, chaotic event accounted for
the inconsistencies" (id.).  In light of those facts,
the Court's affirmance was consistent with the defer-
ence principle of Gaimari and Bleakley.

Moreover, the Appellate Division's explanation was
certainly adequate to justify the rejection of defen-
dant's argument.  We indicated in Bleakley that the
Appellate Division is not required to "manifest its
weight of evidence review power by writing in all
criminal cases" (69 NY2d at 496).  The Court here could
have summarily affirmed without explicitly addressing
the merits of defendant's challenge to the weight of
the evidence.  Had it done so, defendant would have had
no recourse to this Court because it is only "where the
order and writings of the intermediate appellate court
manifest a lack of application of that review power"
that we must reverse and remit for a proper assessment
of the weight of the evidence (id.).  Because we con-
clude that the Appellate Division's review was not
improper, we affirm.

People v. Romero, 7 N.Y.3d 633, 645-46, 859 N.E.2d 902, 910, 826

N.Y.S.2d 163, 171 (2006).

Contemporaneously with his direct appeal, petitioner

also launched a state collateral attack on his conviction.  On or

about August 14, 2004, petitioner filed a motion in the Trial

Court to vacate his conviction pursuant New York Criminal Proce-

17

dure Law Section 440.10 (Appendix - Volume II (Docket Item 20), Exhibit N).  This motion asserted three claims:  (1) petitioner was denied a fair trial as a result of allegedly prejudicial media coverage of the case prior to his first trial; (2) various evidentiary errors were made at trial and (3) newly discovered evidence suggesting that petitioner did not reside near the location where the Collazo's car was recovered.  The Honorable Richard D. Carruthers, Acting Justice of the Supreme Court, denied the first claim on substantive grounds and the remaining claims on procedural grounds on February 4, 2005 (Appendix - Vol. III (Docket Item 21), Ex. O).  The Appellate Division denied petitioner leave to appeal from Justice Carruther's decision on June 21, 2005 (Appendix - Vol. III (Docket Item 21), Ex. R).

After petitioner's conviction was affirmed by the New York Court Appeals, he filed a second 440.10 motion and a motion pursuant to New York Criminal Procedure Law Section 440.20 on or about August 20, 2007 (Appendix - Vol. III (Docket Item 21), Ex. T[5]).  The 440.10 motion challenged petitioner's conviction while

---

[5]Ex. T to the Appendix is a copy of petitioner's 440.20 motion.  Although Exhibit S is identified in the Index to Appendix as petitioner's second 440.10 motion, it is actually a copy of the 440.20 motion, the same document submitted as Ex. T. My staff as contacted respondent's counsel in an effort to obtain a copy of petitioner's second 440.10 motion and has been advised that counsel cannot locate a copy of that document.

(continued...)

the 440.20 motion challenged his sentence.  In support of the challenge to his conviction, petitioner first claimed that the evidence offered against him in his first trial was insufficient to sustain a conviction, and, therefore, his retrial violated his right against being put in jeopardy twice for the same offense. Petitioner also claimed that his conviction had to be overturned because the indictment filed against him only named him in the caption box, while the body of the indictment referred to the "defendants."  Petitioner claimed that an indictment drafted in this manner was insufficient to give him notice of the crime with which he was charged.

Justice Carruthers denied both the 440.10 and the 440.20 motions.  In denying the 440.10 motion, Justice Carruthers stated:

> The defendant's claim concerning the attachment of double jeopardy must fail.  He bases this claim on the alleged insufficiency of the evidence presented at the first trial.  However, the Appellate Division in its decision found that the verdict entered against him was supported by legally sufficient evidence.  Moreover, this is an issue that could have been resolved by a review of the record on direct appeal.  C.P.L. §

---

[5](...continued)
As discussed in the text, the Trial Court's opinion denying petitioner's second 440.10 motion describes the claims raised asserted by petitioner, and petitioner does not assert that the Trial Court's description is inaccurate.  Accordingly, the absence of an actual copy of petitioner's second 440.10 motion is immaterial.

440.10(2-c).  Therefore, this Court cannot re-visit
this claim.

      The defendant's argument that the indictment was
defective must also fail.  Again, this is an issue that
could have been raised on direct appeal.  Furthermore,
were the Court to address this issue, a review of the
indictment shows that it is clearly sufficient.

(Appendix - Volume III (Docket Item 21), Ex. V at 2-3).

      The Appellate Division denied petitioner leave to

appeal from Justice Carruther's decision on or about May 19, 2008

(Appendix - Volume III (Docket Item 21), Ex. Y).


    D.  Petitioner's Claims


      Petitioner here asserts one of the claims that he

asserted on direct appeal and the two claims he asserted in his

second 440.10 motion, namely:  (1) "the prosecution did not come

remotely close to proving [defendant's] guilt beyond a reasonable

doubt, and [the verdict was against] the weight of the evidence;"

(Petitioner's 10/4/12 Memo. at 7) (2) the evidence offered at

petitioner's first trial was legally insufficient and, therefore,

the prohibition against double jeopardy precluded petitioner's

second trial, and (3) the indictment filed against petitioner was

legally deficient because it did not allege the essential ele-

ments of the offense intended to be charged and did not ade-

quately apprise petitioner of the charges he would face at trial (Petitioner's 10/4/12 Memo. at 114-15, 129-30).

Respondent argues that the first claim fails on the merits and that the second and third claims are procedurally barred.

III.  Analysis

      A.  Petitioner's Sufficiency
          of the Evidence Claim
          Fails on the Merits[6]

          1.  Standard of Review

          Where, as here, the habeas petitioner's claim is that

the evidence was insufficient to sustain the verdict, the peti-

tioner faces a particularly heavy burden in order to prevail.  He

must not only show that the evidence was insufficient to estab-

_____

          [6]It is at least fairly arguable that petitioner's
sufficiency-of-the-evidence claim is unexhausted.  It is well-
settled that in order to assert a claim in a federal habeas
corpus petition, a prisoner must first exhaust all available
state remedies.  28 U.S.C. § 2254(b)(1); Aparicio v. Artuz, 269
F.3d 78, 89 (2d Cir. 2001).  Exhaustion requires that the federal
claim be fairly presented in all state courts available to the
prisoner, including in discretionary appeals.  28 U.S.C. §
2254(c); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Daye v.
Attorney Gen., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc).

          As noted in the text, petitioner's sole claim in the New
York Court of Appeals was whether the Appellate Division applied
the correct standard in determining whether the verdict was
against the weight of the evidence (see pp. 16-17, above).  As
discussed in greater length in the text that follows, a claim
that a jury's verdict is against the weight of the evidence is
not a federal claim.  McKinnon v. Superintendent, Great Meadow
Corr. Facility, 422 F. App'x 69, 75 (2d Cir. 2011); Douglas v.
Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (Marrero,
D.J.); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y.
2001).  Nevertheless, even if the sufficiency-of-the-evidence
claim is unexhausted, I may consider it on the merits to deny it.
28 U.S.C. §  2254(b)(2).

lish an essential element of the offense of conviction, but he must also show that the state court was unreasonable in concluding that there was sufficient evidence to sustain the verdict. Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam); Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).  I shall address the nature of each requirement separately.

> a.   Showing Necessary to
>      Establish Insufficiency
>      of the Evidence

In reviewing a claim that evidence was legally insufficient,

> the relevant question is whether, after viewing the
> evidence in the light most favorable to the prosecu-
> tion, any rational trier of fact could have found the
> essential elements of the crime beyond a reasonable
> doubt.  This familiar standard gives full play to the
> responsibility of the trier of fact fairly to resolve
> conflicts in the testimony, to weigh the evidence, and
> to draw reasonable inferences from basic facts to
> ultimate facts.

Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citations and original emphasis omitted); accord United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) ("The question is not whether this [C]ourt believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (inner quotations marks and

citations omitted; emphasis in original); Policano v. Herbert, 507 F.3d 111, 116 (2d Cir. 2007) ("'[A] petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence.'" (internal quotation marks omitted)), quoting Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000); Davis v. Greene, 04 Civ. 6132 (SAS), 2008 WL 216912 at *6 (S.D.N.Y. Jan. 22, 2008) (Scheindlin, D.J.)(same).

Under this "rigorous standard," Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994), "all possible inferences that may be drawn from the evidence must be construed in the prosecution's favor," Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996), citing United States v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993), and the evidence must be viewed in the light most favorable to the prosecution.  United States v. Jass, 569 F.3d 47, 50 (2d Cir. 2009); United States v. Hertular, 562 F.3d 433, 436 (2d Cir. 2009).  Further, "[a]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and are not grounds for reversal;" habeas courts must defer to the jury's assessment of both these issues.  Maldonado v. Scully, supra, 86 F.3d at 35, citing United States v. Rosa, supra, 11 F.3d at 337; see also United States v. Brooker, Docket No. 12-1649-CR, 2013 WL 1748988 at *1 (2d Cir. Apr. 24, 2013) ("[a]ll issues of credibility,

including the credibility of a cooperating witness, must be
resolved in favor of the jury's verdict" (inner quotation marks
and citations omitted)).  A "federal habeas corpus court faced
with a record of historical facts that supports conflicting
inferences must presume -- even if it does not affirmatively
appear in the record -- that the trier of fact resolved any such
conflicts in favor of the prosecution, and must defer to that
resolution." <u>Jackson v. Virginia</u>, <u>supra</u>, 443 U.S. at 326.
Finally, a petitioner's conviction will stand unless the record
is "so totally devoid of evidentiary support that a due process
issue is raised." <u>Bossett v. Walker</u>, 41 F.3d 825, 830 (2d Cir.
1994) (inner quotation marks and citation omitted); <u>see</u> <u>generally</u>
<u>United States v. Josephberg</u>, 562 F.3d 478, 487-88 (2d Cir. 2009).

              b.  Showing Necessary to
                  <u>Warrant Habeas Relief</u>

          If a habeas petitioner succeeds in establishing that
the evidence was insufficient to sustain the conviction, he must
then make the additional showing that the state court  unreason-
ably applied Supreme Court precedent when it reached a contrary
conclusion.

          This second step also requires the habeas petitioner to
meet a stringent standard before the writ can be issued.

Specifically, habeas relief may be granted only when the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).[7]  The Supreme Court has explained the alternative standards set forth in sub-paragraph 1 as follows:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  See also Early v. Packer, 537 U.S. 3, 7-8 (2002) (per curiam) . . . .
>
> Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law.  As we have explained:
>
> > "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.  See Bell v. Cone, 535 U.S. 685, 698-699 (2002); Williams, supra, at 411.  Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an

---

[7]A habeas petitioner's "due process challenge to the sufficiency of the evidence is a mixed question of law and fact, and therefore analyzed under § 2254(d)(1), not § 2254(d)(2)." Torres v. Greene, 290 F. Supp. 2d 396, 400 n.3 (S.D.N.Y. 2003) (Marrero, D.J.), citing Overton v. Newton, 295 F.3d 270, 277 (2d Cir. 2002).

objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Waddington v. Sarausad, 555 U.S. 179, 190 (2009); Brown v. Payton, 544 U.S. 133, 141 (2005); see also Lockyer v. Andrade, 538 U.S. 63, 70-72 (2003); Bierenbaum v. Graham, 607 F.3d 36, 47 (2d Cir. 2010); Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Hawkins v. Costello, 460 F.3d 238, 242-43 (2d Cir. 2006); Brown v. Artuz, 283 F.3d 492, 500-01 (2d Cir. 2002).

In addition to the definition of "unreasonable applica-tion" set forth above, a state court may unreasonably apply Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreason-ably fails to extend a legal rule to a context in which the rule reasonably should apply." Serrano v. Fischer, 412 F.3d 292, 296-97 (2d Cir. 2005); citing Kennaugh v. Miller, 289 F.3d 36, 45 n.2 (2d Cir. 2002). "Unreasonableness is determined by an 'objec-tive' standard." Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005), quoting Williams v. Taylor, 529 U.S. 362, 409 (2000); Hawkins v. Costello, supra, 460 F.3d at 242-43.

Both the "contrary to" and "unreasonable application" clauses "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, supra, 529

27

U.S. at 412 (O'Connor, J. concurring).  "[C]learly established
[f]ederal law . . . refers to the holdings, as opposed to the
dicta, of th[e] Court's decisions as of the time of the relevant
state-court decision." Carey v. Musladin, 549 U.S. 70, 74 (2006)
(internal quotation marks and citations omitted); accord Thaler
v. Haynes, 559 U.S. 43, 47 (2010) ("A legal principle is 'clearly
established' within the meaning of this provision only when it is
embodied in a holding of this Court.").  "That federal law, as
defined by the Supreme Court, may be either a generalized stan-
dard enunciated in the [Supreme] Court's case law or a bright-
line rule designed to effectuate such a standard in a particular
context." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002);
accord Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008).  "A
petitioner [cannot] win habeas relief solely by demonstrating
that the state court unreasonably applied Second Circuit prece-
dent." Yung v. Walker, 341 F.3d 104, 110 (2d Cir. 2003); accord
DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

    Even a ruling that is clearly erroneous is not neces-
sarily a ruling that constitutes an unreasonable application of
federal law. Lockyer v. Andrade, supra, 538 U.S. at 75 (The
"objectively unreasonable" and "clearly erroneous" standards "are
not the same.  The gloss of clear error fails to give proper
deference to state courts by conflating error (even clear error)

28

with unreasonableness."); see also Davis v. Grant, supra, 532
F.3d at 140; Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003).
However, "'the increment [of error beyond clear error] need not
be great; otherwise, habeas relief would be limited to state
court decisions so far off the mark as to suggest judicial
incompetence.'" Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009)
(alteration in original), quoting Francis S. v. Stone, 221 F.3d
100, 111 (2d Cir. 2000).

     The Supreme Court stated in Harrington v. Richter, 562
U.S. ---, ---, 131 S. Ct. 770, 786 (2011), "[u]nder § 2254(d), a
habeas court must determine what arguments or theories supported
or, as here, could have supported, the state court's decision;
and then it must ask whether it is possible fairminded jurists
could disagree that those arguments or theories are inconsistent
with the holding in a prior decision of this Court."

          If this standard is difficult to meet, that is because
          it was meant to be. As amended by AEDPA, § 2254(d)
          stops short of imposing a complete bar on federal court
          relitigation of claims already rejected in state pro-
          ceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664,
          (1996) (discussing AEDPA's "modified res judicata rule"
          under § 2244). It preserves authority to issue the
          writ in cases where there is no possibility fairminded
          jurists could disagree that the state court's decision
          conflicts with this Court's precedents. It goes no
          farther. Section 2254(d) reflects the view that habeas
          corpus is a "guard against extreme malfunctions in the
          state criminal justice systems," not a substitute for
          ordinary error correction through appeal. Jackson v.
          Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J.,

29

concurring in judgment).  As a condition for obtaining
habeas corpus from a federal court, a state prisoner
must show that the state court's ruling on the claim
being presented in federal court was so lacking in
justification that there was an error well understood
and comprehended in existing law beyond any possibility
for fairminded disagreement.

Harrington v. Richter, supra, 131 S. Ct. at 786-87.

To be entitled to the AEDPA's deferential standard of
review, the state courts must have resolved the petitioner's
claims "on the merits." Cotto v. Herbert, supra, 331 F.3d at
230; see also Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002)
("[I]n order for this deferential standard of § 2254 to apply, we
must first determine that the state court considered [peti-
tioner's claim] on its merits."); Sellan v. Kuhlman, 261 F.3d
303, 309-10 (2d Cir. 2001).

The Court of the Appeals for Second Circuit has in-
structed habeas courts to "classify" a state court decision as
either: "(1) fairly appearing to rest primarily on federal law or
to be interwoven with federal law or (2) fairly appearing to rest
primarily on state procedural law." Jimenez v. Walker, 458 F.3d
130, 145 (2d Cir. 2006).  "If the state court's decision falls
into the first category, and does not 'contain a clear statement
of reliance on a state procedural bar,' the decision must be
treated as having been made on the merits." Mateo v. Fishkill
Corr. Facility, 04 Civ. 3420 (DGT), 2007 WL 2362205 at *5

30

(E.D.N.Y. Aug. 14, 2007), quoting Jimenez v. Walker, supra, 458 F.3d at 138.  To make this classification, habeas courts in this circuit examine "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances."  Jimenez v. Walker, supra, 458 F.3d at 145 n.16.

There can be little question that the Appellate Division resolved petitioner's sufficiency-of-the-evidence claim on the merits.  The Appellate Division rejected the claim with the following language:

> The verdict was based on legally sufficient evidence and was not against the weight of the evidence.  The jury properly considered issues of credibility, including the weight to be given to the backgrounds of the People's witnesses, the benefits they received in return for testifying and the inconsistencies in their testimony, and there is no basis for disturbing the jury's determinations (see People v Gaimari, 176 NY 84, 94 [1903]).  Numerous witnesses inculpated defendants, and the jury could have reasonably concluded that differences in their perception and memory of details of this fast-paced, chaotic event accounted for the inconsistencies.

People v. Romero, supra, 22 A.D.3d at 287, 804 N.Y.S.2d at 9.  The language used by the Appellate Division addressed the substance of the claims, and nothing in the prosecution's appellate brief suggested a procedural deficiency with any of the remaining claims.  Thus, I conclude that the Appellate Division's decision is entitled to the deferential standard set forth in the AEDPA.

2.   Application of the
     Foregoing Principles

As noted above, the petition refers to both the suffi-
ciency of the evidence and the weight of the evidence.  Peti-
tioner's supplemental submissions also contain a discussion of
the weight of the evidence (see, e.g., Petitioner's Memorandum of
Law in Support of Petition for Writ of Habeas Corpus, dated Oct.
4, 2012 (Docket Item 57) ("Petitioner's 10/4/12 Memo."), at 105-
06).

To the extent that petitioner is contending that the
verdict is against the weight of the evidence, he has asserted a
state-law claim that is not cognizable in a habeas corpus pro-
ceeding in which a federal court can consider only violations of
federally protected rights.

As explained in Correa v. Duncan, supra, 172 F. Supp.
2d at 381, a claim that a verdict is against the weight of the
evidence is purely a state-law claim that is not cognizable in a
federal habeas corpus proceeding:

> Correa argues that the guilty verdict was against
> the weight of the evidence.  This claim is distinct
> from an attack on a verdict based on the legal suffi-
> ciency of the evidence.  A "weight of the evidence"
> argument is a pure state law claim grounded in New York
> Criminal Procedure Law § 470.15(5), whereas a legal
> sufficiency claim is based on federal due process
> principles.  See Jackson v. Virginia, 443 U.S. 307,
> 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (1979)

>   (Fourteenth Amendment requires record evidence to
>   reasonably support a finding of guilt beyond a reason-
>   able doubt); [s]ee People v. Bleakley, 69 N.Y.2d 490,
>   495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987) (weight of
>   the evidence is based on court's factual review power;
>   sufficiency of evidence claim based on the law).
>   Accordingly, the Court is precluded from considering
>   the claim.  See 28 U.S.C. § 2254(a) (permitting federal
>   habeas corpus review only where the petitioner has
>   alleged that he is in state custody in violation of
>   "the Constitution or a federal law or treaty"); Lewis
>   v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111
>   L.Ed.2d 606 (1990) (habeas corpus review is not avail-
>   able where there is simply an alleged error of state
>   law).

Accord Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y.

2006) (Sweet, D.J.); see also Feliz v. Conway, 378 F. Supp. 2d

425, 430 n.3 (S.D.N.Y. 2005) (Patterson, D.J.); Keane v. N.Y.

State Div. of Parole, 04 CV 2070 (CBA), 2005 WL 1594200 at *2 n.1

(E.D.N.Y. July 5, 2005); Brown v. Filion, 03 Civ. 5391 (DLC)

(GWG), 2005 WL 1388053 at *12 (S.D.N.Y. June 13, 2005) (Report &

Recommendation) (Gorenstein, M.J.), adopted at, 2005 WL 2159675

(S.D.N.Y. Sept. 6, 2005) (Cote, D.J.); Roman v. Filion, 04 Civ.

8022 (KMW)(AJP), 2005 WL 1383167 at *30 (S.D.N.Y. June 10, 2005)

(Report & Recommendation) (Peck, M.J.).

        Thus, to the extent petitioner is claiming that the

verdict was against the weight of the evidence or that the

Appellate Division applied the incorrect standard in assessing

whether the verdict was against the weight of the evidence, he is

asserting a state law claim that cannot be considered in a

federal habeas proceeding.  <u>Swarthout v. Cooke</u>, --- U.S. ---, ---
, 131 S. Ct. 859, 861 (2011) ("The habeas statute unambiguously
provides that a federal court may issue a writ of habeas corpus
to a state prisoner only on the ground that he is in custody in
violation of the Constitution or laws or treaties of the United
States." (internal quotation marks and citations omitted));
<u>Howard v. Walker</u>, 406 F.3d 114, 121 (2d Cir. 2005) (noting that a
claim that a conviction was obtained in violation of state law is
not cognizable in federal court); <u>see also</u> <u>Adams v. Greiner</u>, 02
Civ. 6328 (GEL), 2004 WL 912085 at *2 (S.D.N.Y. Apr. 29, 2004)
(Lynch, then D.J., now Cir. J.)("Habeas corpus is not an exten-
sion of the appeals process in the state court.  Rather, it is a
remedy for violations of a defendant's rights under the federal
constitution, and a very narrow remedy at that.").

        Construing the petition to assert that the evidence was
insufficient to sustain the verdict, I find that petitioner has
failed to establish that no reasonable jury could have found the
elements of murder in the second degree proven beyond a reason-
able doubt and that petitioner has, therefore, failed to meet the
fist step of the two-step process applicable to a habeas petition
seeking relief on the ground of insufficient evidence.

The first step to assessing a habeas petition alleging insufficiency of the evidence is to identify the elements of the offense as defined by state law.  Coleman v. Johnson, --- U.S. ---, 132 S. Ct. 2060, 2064 (2012); Gutierrez v. Smith, supra, 702 F.3d at 113; Langston v. Smith, 630 F.3d 310, 314 (2d Cir. 2011).  The pertinent provision of the New York Penal Law defines murder in the second degree as follows:

> A person is guilty of murder in the second degree when:
>
>> 1. With intent to cause the death of another person, he causes the death of such person or of a third person . . . .

N.Y. Penal L. § 125.25(1).  Thus, to establish petitioner's guilt, the prosecution had to prove two elements:  (1) that petitioner caused the death of Adorno and Flores, and (2) that he did so with the intent to cause the death of Adorno and Flores.  See Washington v. Artus, 07 Civ. 7769 (DAB)(FM) 2013 WL 1285877 at *15 (S.D.N.Y. Mar. 29, 2013) (Maas, M.J.) (Report & Recommendation).  As noted above, although each of the witnesses to the shooting gave a different version of the events, multiple witnesses testified that petitioner was a participant in the shootings, firing a weapon into the car occupied by the victims.  Specifically, Wilson Cruz testified that before the shootings, petitioner told Cruz that he would give Cruz a gun and that

petitioner wanted Cruz "to shoot those mother fuckers" (Tr. 1974, 2188).  Cruz also testified that petitioner fired a gun into the vehicle occupied by Adorno and Flores (Tr. 1993-94, 1997). Although Maria Martinez did not see anything in petitioner's hands, she saw him running toward the car occupied by Adorno and Flores at the time of the shooting (Tr. 671).  Tyrone Rich testified that he saw petitioner running across First Avenue immediately after the shooting holding what Rich believed to be a machine gun (Tr. 1091-95, 1112-13, 1117, 1128, 1152 and 1184-86). Raymond Alvarez testified that he saw petitioner flee from the scene of the shooting immediately after the shots were fired (Tr. 1649).  Frederick McBean testified that he saw petitioner and others fire machine guns into the car occupied by Adorno and Flores and flee from the scene immediately after the shooting (Tr. 1288-97, 1394-95, 1514, 1591).  Cruz also testified that petitioner made statements in which he directly and indirectly admitted to the shootings (Tr. 2005-06, 2007, 2009, 2011). Martinez also testified that petitioner threatened to kill her if she ever said anything about the killings (Tr. 511).  Viewing the evidence, as I must, in the light most favorable to the prosecu- tion, resolving all credibility issues in favor of the prosecu- tion and bearing in mind that the uncorroborated testimony of a single witness is sufficient to establish a fact beyond a reason-

36

able doubt, <u>United States v. Danzey</u>, 594 F.2d 905, 916 (2d Cir. 1979); <u>accord</u> <u>United States v. Frampton</u>, 382 F.3d 213, 222 (2d Cir. 2004), the foregoing testimony is more than sufficient to prove petitioner's guilt beyond a reasonable doubt.  <u>Washington v. Artus</u>, <u>supra</u>, 2013 WL 1285877 at *15 (evidence that petitioner shot victim and fled the scene sufficient to sustain second degree murder conviction); <u>Brown v. Bradt</u>, 11-CV-972 (GLS/CFH), 2013 WL 1636070 at *17 (N.D.N.Y. Mar. 25, 2013) (Report & Recommendation), <u>adopted</u> <u>at</u>, 2013 WL 1628726 (N.D.N.Y. Apr. 16, 2013) (evidence that petitioner argued with victim, pulled a gun from his waist band and shot victim sufficient to sustain second degree murder conviction); <u>Martin v. Smith</u>, 09-CV-5515 (SLT), 2013 WL 420102 at *10 (E.D.N.Y. Feb. 1, 2013) (evidence that petitioner shot victim and made subsequent admissions sufficient to sustain second degree murder conviction); <u>People v. Bell</u>, 44 A.D.3d 1065, 844 N.Y.S.2d 407 (2nd Dep't 2007), <u>lv. to appeal denied</u>, 9 N.Y.3d 1031, 881 N.E.2d 1203, 852 N.Y.S.2d 16 (2008) (evidence that defendant shot victim twice at close range sufficient to sustain second degree murder conviction); <u>People v. Tyler</u>, 43 A.D.3d 633, 634, 841 N.Y.S.2d 193, 194 (4th Dep't), <u>reargument denied</u>, 45 A.D.3d 1424, 845 N.Y.S.2d 211 (4th Dep't), <u>lv. to appeal denied</u>, 9 N.Y.3d 1010, 880 N.E.2d 884, 850 N.Y.S.2d 398 (2007) (evidence that defendant shot the victim multiple

times at close range, striking him once in the abdomen and once in the thigh, causing death, sufficient to sustain second degree murder conviction).

The majority of petitioner's arguments concerning the sufficiency of the evidence consists of attacks on the credibil-ity of the prosecution's witnesses. For example, petitioner claims that Cruz's testimony is not worthy of belief because he was testifying pursuant to a cooperation agreement and that Martinez was threatened with the loss of her child if she refused to testify. Petitioner does not, however, claim that any facts bearing on the credibility of the prosecution's witnesses were withheld from him. Petitioner's attacks on the credibility of the witnesses are really nothing more than an invitation to have this court re-assess the credibility determinations made by the jury. As the authorities cited at pages 24-25 teach, a habeas court cannot revisit the jury's credibility determinations.

Similarly, petitioner's citation of and reliance on the inconsistencies among the testimony given by the percipient witnesses is no basis for habeas relief. See Quartararo v. Hanslmaier, 186 F.3d 91, 95, 96 (2d Cir. 1999), citing Herrera v. Collins, 506 U.S. 390, 401 (1993) (federal habeas courts must not assume "the position of a thirteenth juror;" "inconsistencies were for the jury to resolve" not the district court).

38

Relying on New York Criminal Procedure Law Section 60.22,[8] petitioner also claims that the evidence against him is insufficient because Cruz was an accomplice in the murder and his testimony was not corroborated. This argument fails for two reasons. First, as detailed above, a number of witnesses corroborated Cruz's testimony that petitioner was an active participant in the shooting of Adorno and Flores. Second, it misapprehends the arguments that can be raised in a federal habeas corpus petition. As noted at pages 32-34, above, federal habeas corpus relief is available only where a federally-protected right is violated, i.e. a federal court can grant habeas relief only where a right created by a federal statute or the United States Constitution is violated. Thus, even if Criminal Procedure Law Section

---

[8]New York Criminal Procedure Law Section 60.22 provides, in pertinent part:

> 1. A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.
>
> 2. An "accomplice" means a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in:
>
>> (a) The offense charged; or
>>
>> (b) An offense based upon the same or some of the same facts or conduct which constitute the offense charged.

39

60.22 was violated, such a violation cannot be a basis for federal habeas corpus relief.  Finally, there is no federal requirement applicable in state criminal proceedings that accomplice testimony be corroborated.  As the Court of Appeals noted in <u>Young v. McGinnis</u>, 319 F. App'x 12, 13 (2d Cir. 2009):

> With respect to the Booker murder, we conclude that, regardless of whether there was a violation of state law in denying Young's request for an accomplice-corroboration instruction, there was no violation of federal law, let alone of any federal constitutional right.  <u>See</u> <u>Caminetti v. United States</u>, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("[T]here is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."); <u>United States v. Hamilton</u>, 334 F.3d 170, 179 (2d Cir. 2003) ("The testimony of a single accomplice is sufficient to sustain a conviction so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." (internal quotation marks omitted)).  Accordingly, Young's habeas claims with respect to the Booker murder must fail.

Petitioner also makes an almost-incomprehensible argument concerning the prosecution's ballistics expert.  The prosecution called Detective Robert Tamburi, a ballistics expert with the New York City Police Department.  Because none of the firearms used in the shooting were ever recovered, Detective Tamburi could not offer any evidence that the bullets recovered from the victims were fired from firearms that were tied to petitioner or the other defendants.  Detective Tamburi's testimony was primarily limited to the issues of the number of bullets

recovered from the victims, the number of firearms involved and the probable trajectories of the bullets (Tr. 1859-1913). Detective Tamburi admitted that he erred at petitioner's first trial when he mistakenly connected two bullets recovered from one of the victims with the shooting that lead to that victim's death when, in truth, the bullets had actually been in the victim as the result of an earlier shooting (Tr. 1888-90, 1917-18). Although petitioner claims that Detective Tamburi committed perjury, he offers no proof other than his own self-serving statements and, in any event, Detective Tamburi offered no evidence linking petitioner to the murders.

Petitioner also asserts that there is insufficient evidence to sustain the conviction on the basis of what he characterizes as newly discovered evidence concerning the reliability of conventional ballistics testing and evidence concerning where he resided at in 1990 (Petitioner's 10/4/12 Memo. at 79-86). Because petitioner has not asserted these arguments in state court he cannot assert them here. Cullen v. Pinholster, --- U.S. ---, ---, 131 S.Ct. 1388, 1398 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Finally, petitioner claims throughout his submission that the prosecution knowingly used perjured testimony to convict

41

him.  His only "evidence" to support this claim are the inconsistencies among the witnesses and his claim of innocence.  Inconsistencies among witnesses are not proof of dishonesty.  "Differences in recollection alone do not add up to perjury." United States v. Sanchez, 969 F.2d 1409, 1415 (2d Cir. 1992), citing United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir. 1989) and United States v. Sprayregen, 577 F.2d 173, 175 (2d  Cir. 1978). As the Appellate Division noted, the circumstances of the shooting itself -- multiple gunmen in a densely populated urban neighborhood, firing automatic weapons in a rapidly evolving, chaotic shootout that was over in a matter of minutes -- could very easily account for the differences among the witnesses.  As for petitioner's unilateral claim of innocence, if such a claim were sufficient to prove perjury, no defendant could ever be convicted.

        Given the considerable differences among the witnesses' testimony, petitioner's reaction to the verdict is understandable.  Multiple witnesses, however, identified petitioner as one of the individuals firing into the victims' car, and petitioner's statements both before and after the shooting corroborate his involvement.  Although the inconsistencies among the witnesses are troubling, the prosecution's evidence was clearly sufficient to prove petitioner's guilt.

B.   Petitioner's Double Jeopardy
     Claim and Claim Directed to
     the Adequacy of the Indictment
     Are Procedurally Barred

    A habeas petitioner's constitutional claim can be

procedurally barred if it has not been asserted in state court

proceedings in accordance with state procedural requirements and

the state courts rely on that violation of state procedural

requirements to reject the claim.  As the Court of Appeals for

the Second Circuit has explained:

        The independent and adequate state ground doctrine
    first arose in the context of direct appeals to the
    Supreme Court from final judgments of the state courts.
    Under that doctrine the Supreme Court "will not review
    a question of federal law decided by a state court if
    the decision of that court rests on a state law ground
    that is independent of the federal question and ade-
    quate to support the judgment."  Coleman v. Thompson,
    501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640
    (1991).  Moreover, "[t]his rule applies whether the
    state law ground is substantive or procedural."  Id.

                    *      *      *

        The doctrine also applies in the context of fed-
    eral courts reviewing applications for a writ of habeas
    corpus . . . .  [I]nvoking principles of comity and
    federalism . . . federal habeas courts faced with an
    independent and adequate state ground of decision defer
    in the same manner as does the Supreme Court on direct
    review.

Garcia v. Lewis, 188 F.3d 71, 76 (2d Cir. 1999); see also Beard

v. Kindler, 558 U.S. 53, 55 (2009) ("A federal habeas court will

not review a claim rejected by a state court if the decision of

[the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." (inner quotations omitted; alteration in original)); Cone v. Bell, 556 U.S. 449, 465 (2009) (same); Kozlowski v. Hulihan, Docket Nos. Nos. 12-0764-pr(L), 12-0776-pr(CON), 2013 WL 406531 at *2 (2d Cir. Feb. 4, 2013) (same); Rush v. Lempke, 500 F. App'x 12, 15 (2d Cir. 2012) (same); Bierenbaum v. Graham, 607 F.3d 36, 47 (2d Cir. 2010) (same); Cotto v. Herbert, supra, 331 F.3d at 238-39 (2d Cir. 2003); Rhagi v. Artuz, 309 F.3d 103, 106 (2d Cir. 2002), citing Coleman v. Thompson, supra, 501 U.S. at 729-31 ("[I]t is settled law that an independent and adequate state law ground for a state court conviction cannot be disturbed on habeas."); Brown v. State of New York, 04-CV-1087 (NG)(VVP), 2006 WL 3085704 at *2 (E.D.N.Y. Oct. 30, 2006) ("When a habeas corpus petitioner defaults a federal claim in state court . . . by failing to preserve the claim for state appellate review . . . , the independent and adequate state ground doctrine bars federal habeas corpus review."); Rivera v. Moscicki, 03 Civ 5810 (SAS), 2005 WL 2347840 at *2 (S.D.N.Y. Sept. 22, 2005) (Scheindlin, D.J.) ("A federal court generally may not review a state court decision that expressly relies on a procedural default as an independent and adequate state ground for dismissal." (footnote omitted)).

Dismissal of a claim on the ground that consideration of the merits is precluded by an adequate and independent state procedural ground is appropriate where the last reasoned state court decision expressly relies on a state procedural bar:

> In <u>Harris</u> [v. Reed, 489 U.S. 255 (1989)], the Court held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." <u>Harris</u>, 489 U.S. at 263, 109 S.Ct. 1038 (internal quotation marks omitted). We apply the <u>Long/Harris</u> presumption to the last "reasoned state judgment" . . . . <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

<u>Jones v. Stinson</u>, 229 F.3d 112, 118 (2d Cir. 2000). <u>See</u> <u>also</u> <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001) ("We have repeatedly stated that in order for federal habeas review to be procedurally barred, a state court must actually have relied on a procedural bar as an independent basis for its disposition of the case, and the state court's reliance on state law must be unambiguous and clear from the face of the opinion.").

As long as the state court relies on a procedural bar as an independent basis for its decision, a claim will be procedurally barred on federal habeas review even where a state court addresses the merits of the claim in the alternative. As the Court of Appeals for the Second Circuit has noted:

45

>This court has held that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); Harris, 489 U.S. at 264 n.10, 109 S.Ct. at 1044 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding"); Wedra v. Lefevre, 988 F.2d 334, 338-39 (2d Cir. 1993).

Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996). See also Robles v. Superintendent of Elmira Fac., 07 Civ. 596 (LBS), 2007 WL 2600857 at *3 n.3 (S.D.N.Y. Aug. 30, 2007) (Sand, D.J.); Ashley v. Burge, 05 Civ. 4497 (JGK), 2006 WL 3327589 at *5 n.5 (S.D.N.Y. Nov. 3, 2006) (Koeltl, D.J.).

However, even where the last reasoned decision of the state court expressly rejects a federal constitutional claim on a state procedural ground, federal habeas corpus review will not be precluded if (1) the state procedural ground is not independent and adequate, see Jimenez v. Walker, supra, 458 F.3d at 138; Monroe v. Kuhlman, 433 F.3d 236, 241-42 (2d Cir. 2006); Cotto v. Herbert, supra, 331 F.3d at 238-39; (2) there is cause for and prejudice from petitioner's failure to assert his claims in accordance with state procedural law or (3) a failure to consider the claim would result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 324-27 (1995); Coleman v. Thompson, supra, 501 U.S. at 748-50; Harris v. Reed, 489 U.S. 255, 262

46

(1989); Gutierrez v. Smith, 702 F.3d 103, 111 (2d Cir. 2012);

DiSimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006); Green v.

Travis, 414 F.3d 288, 294 (2d Cir. 2005).  A state law bar is not

"adequate" when it is not "firmly established and regularly

followed . . . or . . . despite being firmly established, it was

an exorbitant application of a generally sound rule." Wright v.

Duncan, 500 F. App'x 36, 37 (2d Cir. 2012) (internal quotations

and citations omitted).  A habeas petitioner can establish

"cause" by showing that "some objective factor, external to

Petitioner's defense, interfered with his ability to comply with

the state's procedural rule." Gutierrez v. Smith, supra, 702

F.3d at 111.  A habeas petitioner can establish prejudice by

showing that "[t]he error must have resulted in 'substantial

disadvantage, infecting [the] entire trial with error of consti-

tutional dimensions.'" Gutierrez v. Smith, supra, 702 F.3d at

112 (second alteration in original), quoting Murray v. Carrier,

477 U.S. 478, 494 (1986).  Finally, to establish a fundamental

miscarriage of justice, a habeas petitioner must show that a

constitutional violation probably resulted in his conviction

despite his actual innocence.  United States v. Olano, 507 U.S.

725, 736 (1993) ("In our collateral-review jurisprudence, the

term 'miscarriage of justice' means that the defendant is actu-

ally innocent."); Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir.

2003) ([A] "habeas petitioner may avoid [a procedural] default .
. . by showing . . . that failure to consider the claim will
result in miscarriage of justice, <u>i.e.</u>, the petitioner is actu-
ally innocent."); <u>accord</u> <u>Johnson v. Bellnier</u>, 508 F. App'x 23, 25
(2d Cir. 2013); <u>Sanchez v. Lee</u>, 508 F. App'x 46, 48 (2d Cir.
2013).

Here, the Trial Court rejected petitioner's double
jeopardy claim and his claim challenging the adequacy of the
indictment with the following language:

> The defendant's claim concerning the attachment of
> double jeopardy must fail.  He bases this claim on the
> alleged insufficiency of the evidence presented at the
> first trial.  However, the Appellate Division in its
> decision found that the verdict entered against him was
> supported by legally sufficient evidence.  Moreover,
> this is an issue that could have been resolved by a
> review of the record on direct appeal.  C.P.L. §
> 440.10(2-c).  Therefore, this Court cannot re-visit
> this claim.
>
> The defendant's argument that the indictment was
> defective must also fail.  Again, this is an issue that
> could have been raised on direct appeal.  Furthermore,
> were the Court to address this issue, a review of the
> indictment shows that it is clearly sufficient.

(Appendix - Volume III (Docket Item 21), Ex. V at 2-3).

The statute cited by the Trial Court -- New York
Criminal Procedure Law Section 440.10(2)(c) -- provides that a
court must deny a motion to vacate a judgment when:

> Although sufficient facts appear on the record of
> the proceedings underlying the judgment to have permit-

ted, upon appeal from such judgment, adequate review of
the ground or issue raised upon the motion, no such
appellate review or determination occurred owing to the
defendant's unjustifiable failure to take or perfect an
appeal during the prescribed period or to his unjusti-
fiable failure to raise such ground or issue upon an
appeal actually perfected by him.

The Trial Court's express reference to this statute and its
observation that both claims raised in petitioner's second 440.10
motion could have been raised on direct appeal constitutes an
express rejection of the claims for failure to assert them on
direct appeal in conformity with New York's procedural require-
ments.  As explained above, the fact that the Trial Court ad-
dressed the merits of the clams in the alternative does not alter
the finding that the claims are procedurally barred.  In addi-
tion, because the Appellate Division denied petitioner leave to
appeal from the denial of his second 440.10 motion, the Trial
Court's decision constitutes that last reasoned state court
decision addressing the claims.  Harris v. Reed, supra, 489 U.S.
at 262; see Ylst v. Nunnemaker, supra, 501 U.S. at 803 ("Where
there has been one reasoned state judgment rejecting a federal
claim, later unexplained orders upholding that judgment or
rejecting the same claim [are presumed to] rest upon the same
ground.").  Thus, the New York Supreme Court's rejection of
petitioner's claims gives rise to a procedural bar to federal
habeas review.

49

        The Court of Appeals has expressly held that New York
Criminal Procedure Law Section 440.10(2)(c) constitutes an
adequate and independent ground for the denial of a habeas
petitioner's claims.  Clark v. Perez, 510 F.3d 382, 393 (2d Cir.
2008) ("We conclude that the district court erred in holding that
the state court's application of section 440.10(2)(c) did not
constitute an adequate state procedural bar to Clark's federal
habeas petition."); accord Felton v. Mazzuca, 98 Civ. 4567 (RJS),
2012 WL 4462009 at *7 (S.D.N.Y. Sept. 27, 2012) (Sullivan, D.J.);
see also Davis v. Mantello, 42 F. App'x 488, 490 (2d Cir. 2002);
Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001).  Petitioner
makes no argument to the contrary.

        Petitioner can overcome this procedural bar by demon-
strating either (1) cause for and prejudice from petitioner's
failure to assert his claim in accordance with state procedural
law or (2) that a failure to consider the claim would result in a
fundamental miscarriage of justice.  Schlup v. Delo, supra, 513
U.S. at 324-27; Coleman v. Thompson, supra, 501 U.S. at 748-50;
Harris v. Reed, supra, 489 U.S. at 262; Green v. Travis, supra,
414 F.3d at 294.  He does not, however, meet either standard.

        In his most recent submission, petitioner claims that
the attorney who represented him on direct appeal should have
raised his double jeopardy claim (Memorandum of Law in Support of

                                    50

Ubaldo Romero's Petition for Writ of Habeas Corpus, dated April
18, 2013 (Docket Item 63) ("April 2013 Memo.") at 68).  Even
assuming the truth of petitioner's explanation for his failure to
assert his double jeopardy claim in accordance with New York's
procedural requirements, this argument fails as a matter of law.
In Edwards v. Carpenter, 529 U.S. 446 (2000), the Supreme Court
held that an attorney's misconduct can constitute cause for a
procedural default only when the attorney's misconduct rises to
the level of an independent Sixth Amendment violation that has
itself been exhausted in state court:

> [I]n certain circumstances counsel's ineffectiveness in
> failing properly to preserve the claim for review in
> state court will suffice [to constitute cause].
> [Murray v. ] Carrier, 477 U.S. [478,] 488-89 [(1986)].
> Not just any deficiency in counsel's performance will
> do, however; the assistance must have been so ineffec-
> tive as to violate the Federal Constitution.  Ibid.  In
> other words, ineffective assistance adequate to estab-
> lish cause for the procedural default of some other
> constitutional claim is itself an independent constitu-
> tional claim.  And we held in Carrier that the princi-
> ples of comity and federalism that underlie our long-
> standing exhaustion doctrine -- then as now codified in
> the federal habeas statute, see 28 U.S.C. §§
> 2254(b),(c) -- require that constitutional claim, like
> others, to be first raised in state court.

529 U.S. at 451-52 (emphasis in original); accord Gibson v.
Phillips, 263 F. App'x 78, 80 (2d Cir. 2008); DiSimone v.
Phillips, 461 F.3d 181, 191 (2d Cir. 2006); Sweet v. Bennett, 353
F.3d 135, 141 n.7 (2d Cir. 2003); Ortiz v. Ercole, 08 Civ. 9723

(LBS), 2012 WL 1448445 at *4 n.1 (S.D.N.Y. Apr. 18 2012) (Sand, D.J.).  Because petitioner never raised any claim in state court that his appellate counsel was ineffective, he cannot assert counsel's alleged dereliction as a cause for the failure to exhaust his double jeopardy claim in accordance with state law.

Petitioner also makes a conclusory assertion that the failure to consider the merits of his double jeopardy claim will result in a fundamental miscarriage of justice (April 2013 Memo. at 72).  As explained above, to establish a fundamental miscarriage of justice, petitioner must make a showing of actual innocence.  Although petitioner's submissions repeatedly claim innocence, petitioner offers no evidence of his innocence.[9]

_____

[9]If I were to consider the merits of petitioner's double jeopardy claim, I would conclude that it fails on the merits. Petitioner contends that his double jeopardy rights were violated because the evidence offered at his first trial was insufficient to sustain a conviction and that instead of declaring a mistrial, the Trial Court should have dismissed the indictment at the conclusion of the first trial.

This precise claim was considered and rejected by the Court of Appeals for the Second Circuit in United States v. Ustica, 847 F.2d 42 (2d Cir. 1988).  As explained in that case,

> [T]he Supreme Court has determined that where there has been a mistrial because of a hung jury, the Double Jeopardy Clause does not bar retrial -- regardless of any evidentiary insufficiency at the first trial. Richardson v. United States, 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).  In Richardson, the Court explained that unlike an appellate reversal on
> (continued...)

Accordingly, petitioner's double jeopardy claim and his claim that the indictment was defective should be dismissed as procedurally barred.

---

[9](...continued)
insufficiency grounds, a mistrial because of a hung jury is not an "event" that terminates the original jeopardy to which the defendant was subject. Therefore, following such a mistrial, even if an appellate court could determine that the prosecution's evidence was insufficient to support a conviction, a defendant nonetheless has no valid double jeopardy claim:

Since jeopardy attached here when the jury was sworn, petitioner's argument necessarily assumes that the judicial declaration of a mistrial was an event which terminated jeopardy in his case and which allowed him to assert a valid claim of double jeopardy . . . .  [W]e hold . . . that the failure of the jury to reach a verdict is not an event which terminates jeopardy.

\*       \*       \*

The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.

Id. at 325-26, 104 S.Ct. at 3086-87 (citations omitted) (emphasis added).

847 F.2d at 48 (first alteration added); accord Robertson v. Artus, No. 9:04-CV-946, 2008 WL 553200 at \*4-\*5 (N.D.N.Y. Feb. 27, 2008).

IV.   Conclusion

        Accordingly, for all the foregoing reasons, I respect-
fully recommend that the petition be denied in all respects.

        In addition, because petitioner has not made a substan-
tial showing of the denial of a constitutional right, I also
recommend that a certificate of appealability not be issued.   28
U.S.C. § 2253.   To warrant the issuance of a certificate of
appealability, "petitioner must show that reasonable jurists
could debate whether . . . the petition should have been resolved
in a different manner or that the issues presented were adequate
to deserve encouragement to proceed further."   Middleton v.
Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005) (per curiam)
(citation and internal quotation marks omitted; alteration in
orignal); see also Love v. McCray, 413 F.3d 192, 195 (2d Cir.
2005) (per curiam).   For the reasons set forth above, I conclude
that there would be no difference of opinion among reasonable
jurists that petitioner's federal rights were not violated.

        I further recommend that certification pursuant to 28
U.S.C. § 1915(a)(3) not be issued because any appeal from this
Report and Recommendation, or any Order entered thereon, would
not be taken in good faith.   See Coppedge v. United States, 369
U.S. 438, 445 (1962).

V.   <u>Objections</u>

      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul A. Engelmayer, United States District Judge, 40 Centre Street, Room 2201, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Engelmayer.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         July 15, 2013

                                   Respectfully submitted,


                                   _____
                                   HENRY PITMAN
                                   United States Magistrate Judge

Copies mailed to:

Mr. Ubaldo Romero
DIN 02-A-1716
Wende Correctional Facility
3040 Wende Road
Alden, New York 14004-1187

Susan Gliner, Esq.
Assistant District Attorney
New York County
One Hogan Place
New York, New York   10013